1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   MORRIS ROBINSON,                        No. 1:21-cv-00990-ADA-SAB (PC)

12                  Plaintiff,               FINDINGS AND RECOMMENDATIONS
                                             REGARDING DEFENDANT GOLLER'S
13          v.                               MOTION FOR SUMMARY JUDGMENT

14   J. FARMBROUGH, et al.,                   (ECF Nos. 52, 56)

15                  Defendants.

16

17          Plaintiff Morris Robinson is proceeding pro se and in forma pauperis in this civil rights

18   action filed pursuant to 42 U.S.C. § 1983.

19          Currently before the Court is Defendant Goller's motion for summary judgment, filed

20   April 14, 2023, and refiled on April 19, 2023, with the proper Rand notice. (ECF Nos. 52, 56.)

21                                          I.

22                            PROCEDURAL BACKGROUND

23          This action is proceeding on Plaintiff's excessive force claim against Defendants

24   Fambrough, Johnson, Silva, Bedolla and Furlong for excessive force, failure to intervene claim

25   against Defendants Cruz and Rodriguez, and deliberate indifference claim against Defendants

26   Serna, Rhoades, and Dr. Goller.

27          Defendant Goller filed an answer to the complaint on January 20, 2022. (ECF No. 28.)

28          Defendants Fambrough, Johnson, Silva, Bedolla, Furlong, Cruz, Rodriguez, Serna and

                                            1

1  Rhoades filed an answer to the complaint on February 10, 2022.  (ECF No. 31.)

2          On March 10, 2022, the Court issued the discovery and scheduling order.  (ECF No. 39.)

3          On April 14, 2023, Defendant Goller filed a  motion for summary judgment.  (ECF No.

4  52.)  Defendant re-filed the motion with the proper Rand notice on April 19, 2023.  (ECF No. 56.)

5                                                **II.**

6                                       **LEGAL STANDARD**

7          **A.      Summary Judgment Standard**

8          Any party may move for summary judgment, and the Court shall grant summary judgment

9  if the movant shows that there is no genuine dispute as to any material fact and the movant is

10  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);

11  Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position,

12  whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular

13  parts of materials in the record, including but not limited to depositions, documents, declarations,

14  or discovery; or (2) showing that the materials cited do not establish the presence or absence of a

15  genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.

16  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the

17  record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen

18  v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v.

19  Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

20          In judging the evidence at the summary judgment stage, the Court does not make

21  credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509

22  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

23  inferences in the light most favorable to the nonmoving party and determine whether a genuine

24  issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v.

25  City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation

26  omitted).

27          In arriving at these Findings and Recommendations, the Court carefully reviewed and

28  considered all arguments, points and authorities, declarations, exhibits, statements of undisputed

1  facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of

2  reference to an argument, document, paper, or objection is not to be construed to the effect that

3  this Court did not consider the argument, document, paper, or objection. This Court thoroughly

4  reviewed and considered the evidence it deemed admissible, material, and appropriate.

5  **III.**

6  **DISCUSSION**

7  **A.    Summary of Plaintiff's Complaint**

8  On March 5, 2019, Plaintiff was ducated to the C-yard medical clinic at Kern Valley State

9  Prison (KVSP).  When Plaintiff arrived at the clinic, he was instructed by officer J. Fambrough to

10  proceed to the exam room three for evaluation.  As Plaintiff approached room three, the nurse

11  exited and stated, "I'll be right back."  As Plaintiff stood at the door, another nurse told him he

12  could sit in a chair outside room three.  After Plaintiff sat in the chair for about two to three

13  minutes, officer Fambrough approached and stated, "get up, that's my chair."  Plaintiff got up and

14  stated, "the nurse told me to 'have a seat' in this chair."  Officer Fambrough responded, "I don't

15  care what she told you, I told you to get up."  Plaintiff stated, "you don't need to yell or talk to me

16  like a child, because I am not, I'm 57 years old."  Fambrough then stated, "and I'm 64.  Go in the

17  exam room and sit on the table."  Officer Fambrough followed Plaintiff into the room and told

18  him to "get up on the table."  Plaintiff told Fambrough that he could not "get up on the table due

19  to neck and back issues, which is why I am here."  Fambrough instructed Plaintiff to "get up on

20  the table."   Plaintiff replied, "I cannot get on the table my back hurts, Mr. Fambrough, you can

21  check the computer, my back is jacked."

22  Fambrough then grabbed Plaintiff from behind in a choke hold and picked Plaintiff up off

23  his feet and body slammed him to the concrete floor.  Fambrough then began to strike Plaintiff

24  with closed fists in the head and torso area and smashed his head onto the concrete floor.  Officers

25  Johnson and Silva entered the room and began to kick Plaintiff.  Johnson kicked Plaintiff's head

26  area and Silva kicked his groin and lower body.  Silva then got on his knees and began to strike

27  Plaintiff in the torso area.  The incident continued for approximately two minutes, while several

28  other officers entered the room, including officers M. Bedolla and Furlong.  Plaintiff "begged"

1   the officers to "make them stop," but officer Bedolla began to jump and stomp on Plaintiff's

2   head, torso and groin until she slipped and fell on the floor.  When Bedolla was on the floor, she

3   began to knee Plaintiff in the groin and upper thigh area.  Officer Furlong then started to kick

4   Plaintiff in the head and torso area.  Officers Johnson and Silva exited the room and yelled orders

5   as more officers arrived.  Officer Furlong then straddled Plaintiff while kneeing him in the ribs

6   and torso area.  During the entire incident, officer Fambrough had one hand around Plaintiff's

7   neck and would intermittently pinch Plaintiff with his free hand.

8          Officer Fambrough thereafter grabbed Plaintiff's left arm and began to twist it.  Plaintiff

9   observed that lieutenant Rodriguez and sergeant Cruz and yelled, "Please, make them stop…

10   they're breaking my arm."  Fambrough continued to punch Plaintiff in the head and arm, and

11   Rodriguez and Cruz ignored Plaintiff's request for help.  Sergeant Cruz finally stepped in and

12   said "that's enough guys … cuff him up and take him to the cage."

13          While Plaintiff was in cage, licensed vocational nurse J. Cudal examined Plaintiff for

14   injuries.  Cudal asked Plaintiff "what happened?" and Plaintiff stated he "was the victim of

15   'excessive force' and 'unnecessary use of force.'"  Cudal ignored Plaintiff's comment and did not

16   write it on the comment section of the injury report.  Cudal then asked Plaintiff "if he had any

17   injures?"  Plaintiff stated "he was having difficulty breathing and some ribs on his left side may

18   be brokened [sic]."  Cudal then asked if he had any "visible injuries."  Plaintiff indicated that "his

19   arm and shoulder was injured as well[,]" but Cudal ignored him.

20          Officers Lomeli and Luzon packed Plaintiff's personal property and took it the program

21   office.  Officer Furlong broke Plaintiff's television screen with his collapsible baton.  Plaintiff

22   was then transferred to administrative segregation without a medical exam or x-ray, and Plaintiff

23   advised officers that he was in pain.

24          On March 6, 2019, Plaintiff was summoned to talk to licensed vocational nurse Graywall

25   regarding his appointment the previous day.  Graywall referred Plaintiff for x-rays.

26          On March 6, 2019, Plaintiff filed an inmate grievance regarding the damage to his

27   television by officer Furlong.

28          On March 7, 2019, Plaintiff was not called for x-rays.

1    On March 8, 2019, Plaintiff was brought out of administrative segregation to talk to
2    lieutenant Martinez and sergeant Flores regarding the use of force incident.  Plaintiff saw
3    Graywall again and requested x-rays for his rib cage left flank pain.  Graywall instructed officers
4    to escort Plaintiff to the central treatment center for x-rays.  Serna and Rhodes conducted the x-
5    rays of Plaintiff's lower and upper torso.  Plaintiff contends this x-ray revealed multiple rib
6    fractures which Serna and Rhodes failed to recognize in an attempt to cover-up the incident.  Dr.
7    Goller conducted an analysis of the x-rays and found no rib abnormality which Plaintiff contends
8    was false in an attempt to cover-up the incident.

9    On March 19, 2019, an officer who falsely identified himself as lieutenant Fitzpatrick and
10   officer Solez went to interview Plaintiff regarding his grievance.  Fitzpatrick attempted to
11   interview Plaintiff regarding the alleged staff complaint as to the use of force, but Plaintiff
12   indicated the grievance was in regard to the damage to his television.  The appeals office later
13   cancelled Plaintiff's appeal indicating he refused to be interviewed.

14   On March 9, 2019, Plaintiff went to Institution Classification Committee (ICC) regarding
15   the incident.  Plaintiff stated, "I did nothing wrong... I was the victim of excessive and
16   unnecessary use of force."  Associate Warden S. Swaim become angry and stated, "you did
17   something wrong" and had Plaintiff removed from the hearing.

18   On March 12, 2019, Plaintiff filed an inmate appeal relating to the pain in his left shoulder
19   that occurred as a result of the incident on March 5, 2019.

20   On March 18, 2019, Plaintiff received a Rules Violation Report (RVR) by sergeant Cruz
21   who witnessed most of the assault.  Plaintiff requested an investigative employee and officer M.
22   Bedolla was assigned-who participated in the assault and use of force.  Plaintiff thereafter
23   requested that Bedolla be removed as investigator, but she stated it was legal for her to be the
24   investigating employee.

25   From March 8, 2019 to April 4, 2019, Plaintiff suffered sharp pain his left rib cage area
26   when breathing, coughing, or sneezing with a pain scale of 6-7 out of 10.  During this month,
27   Plaintiff submitted several requests for medical attention.  Graywall and physician assistant C.
28   Relevante were the medical staff responsible for Plaintiff while he was housed in administrative

1  segregation.

2  In early April, Plaintiff saw Graywall and asked about his status.  Graywall told Plaintiff

3  to talk to Relevante.  Relevante reviewed the x-rays and stated there was no broken ribs.  Plaintiff

4  advised Graywall that his ribs "still hurt."  Graywall indicated she would refer Plaintiff for more

5  x-rays.

6  On April 2, 2019, Plaintiff filed an inmate grievance regarding the excessive force.  On

7  April 8, 2019, the appeal was screened out as duplicative of the grievance regarding the damage

8  to his television.

9  On April 11, 2019, Plaintiff was escorted to radiology for x-rays.  On April 13, 2019,

10  Plaintiff was escorted to see registered nurse Asuncion regarding the x-rays who referred him to

11  Dr. Ulit.  Dr. Ulit explained that Plaintiff had multiple fractured ribs, and Plaintiff indicated he

12  did not want to go to outside medical.

13  On April 14, 2019, Plaintiff was called for an interview with lieutenant Ostrander prior to

14  the actual hearing on the RVR.  Plaintiff advised Ostrander of the corruption and conspiracy to

15  cover-up the use of force incident.   Ostrander stated he would interview the involved parties and

16  witnesses.

17  On April 15, 2019, Plaintiff went to the RVR hearing and lieutenant Ostrander was the

18  Senior Hearing Officer (SHO).  Plaintiff plead not guilty and requested to confront witness

19  inmate Rogers who observed everything.  However, Plaintiff's request was denied.

20  On April 17, 2019, Plaintiff filed another inmate grievance regarding the cancellation of

21  his prior appeal as duplicative.

22  On May 9, 2019, Plaintiff went to the ICC hearing and was assessed a 120 day security

23  housing unit term.

24  On May 7, 2019, Plaintiff write the Warden Pfeiffer a four page letter informing him that

25  excessive force was used and a subsequent cover-up was occurring because Plaintiff was being

26  accused of staff assault/battery on a peace officer.  Plaintiff requested that the Warden's office

27  investigate the incident.

28  On May 8, 2019, Plaintiff filed an inmate appeal alleging that Defendants were

deliberately indifferent to his medical needs and engaged in a conspiracy to cover-up the serious bodily injury.

On May 31, 2019, Plaintiff filed an inmate grievance regarding the RVR, but the appeal was never logged or responded to.

On June 11, 2019, Plaintiff wrote the Warden again informing him that he was denied a thorough investigation into the incident.  Plaintiff advised the Warden that appeals coordinator A. Leyva and J. Fitzpatrick were engaging in a conspiracy cover-up by impeding an investigation into the incident.

On November 19, 2019, Plaintiff again filed an inmate grievance that was never lodged or responded to.

On June 17, 2020, Plaintiff filed an inmate grievance relating to the alleged corruption by officer, but the appeal was never logged or responded to.

**B.     Statement of Undisputed Facts[1]**

1.     On March 3, 2019, Plaintiff submitted a Health Care Services Request Form reporting neck and back pain which was disrupting his sleep and daily activities, and complaining of ear pain and fullness.  (ECF No. 56-1, MSJ, Ex. A at 36:6-23, Ex. B at --65.)

2.     Plaintiff was "triaged" for his March 3, 2019 request on March 5, 2019 at 7:00 a.m., which is the date of the incident at issue in this case.  (ECF No. 56-1, MSJ, Ex. B at 0065.)

3.     On March 5, 2019 at 8:53 a.m., Jonamay Cudal, LVN charted a "Code 1" involving Plaintiff, and noted that Plaintiff "sustained abrasion to left knee and stated he has pain in his left shoulder.  No [shortness of breath] or [signs or symptoms] of distress."  (ECF No. 56-1, MSJ, Ex. B at 0037.)

4.     Plaintiff was involved in a physical altercation on March 5, 2019; however, his medical records for this date do not contain any specific reference to an altercation.  (ECF No. 1 at 14; ECF No. 56-1, MSJ, Ex. A at 41:7-54:2, Ex. B at 0037.)

5.     On March 6, 2019, Plaintiff presented to Inderjeet Grewal, RN for complaints of chronic neck and low back pain that was worsening, plugged and painful ears, and left lateral rib

---

[1] Hereinafter referred to as "UF."

1  area pain.  (ECF No. 56-1, MSJ, Ex. B at 0021-0028.)

2        6.      Notations in the record of March 6, 2019 indicate that Plaintiff was "status post

3  altercation incident."  (ECF No. 56-1, MSJ, Ex. B at 0021.)

4        7.      Nurse Grewal observed that Plaintiff  was uncomfortable due to pain, that his gait

5  was "slow, but steady," that he was alert and oriented x 3, his respirations were unlabored and his

6  speech was clear.  (ECF No. 56-1, MSJ, Ex. B at 0023.)

7        8.      On exam, Plaintiff complained of pain in his left lateral rib area, that was tender to

8  touch, and pain with deep breathing, but Nurse Grewal did not observe any bruising or

9  discoloration.  (ECF No. 56-1, MSJ, Ex. B at 0025.)

10        9.      A left ribs x-ray was ordered, and Plaintiff was given discharge information

11  concerning findings of a "rib contusion."  (ECF No. 56-1, MSJ, Ex. B at 0028, 0042, 0052-56.)

12        10.     Plaintiff was again seen by Nurse Grewal on March 8, 2019 for a follow up

13  concerning his left ear, at which time his exam was unremarkable, though he complained of a

14  headache that was not resolved with ibuprofen; Plaintiff asked when he would be getting his x-

15  ray, stating that he was having severe pain in his ribs.  (ECF No. 56-1, MSJ, Ex. B at 0038.)

16        11.     Radiology was contacted, and Nurse Grewal was instructed to send him to

17  radiology that day.  (ECF No. 56-1, MSJ, Ex. B at 0038.)

18        12.     The March 8, 2019 order for the x-ray was given with "high priority (within 14

19  days)" for "rib pain s/p altercation incident."  (ECF No. 56-1, MSJ, Ex. B at 0042.)

20        13.     Dr. Goller was the radiologist that read and interpretated Plaintiff's March 8, 2019

21  x-ray.  (ECF No. 1 at 17, 35; ECF No. 56-1, MSJ, Ex. B at 47, 49.)

22        14.     The clinical history for the x-ray was noted as "Left rib pain."  (ECF No. 56-1,

23  MSJ, Ex. B at 0049.)

24        15.     Dr. Goller's findings were as follows: "No fracture, lytic lesion, or sclerotic lesion

25  is seen involving the ribs.  No pleural effusion or pneumothorax is present.  The visualized lungs

26  are clear.  The visualized portion of the heart and the mediastinum are unremarkable" and his

27  impression was "No rib abnormality identified."  (ECF No. 1 at 41, ECF No. 56-1, MSJ, Exs. C

28  & D.)

16.     On or about March 27, 2019, PA Relevante told Plaintiff that the x-ray did not show any fracture.  (ECF No. 56-1, MSJ, Ex. A at 105:1-23, 107:7-12.)

17.     On March 27, 2019, the date Plaintiff was told the March 8, 2019 x-ray did not show anything, including a rib fracture, Plaintiff believed that "everybody that I came in contact with" "was misrepresenting the truth" and that "there was a coverup from the beginning when I told them my ribs was broke … all the way to the second set of x-rays."  (ECF No. 56-1, MSJ, Ex. A at 110:14-111:23.)

18.     Plaintiff again complained of left rib pain on March 28, 2019.  (ECF No. 56-1, MSJ, Ex. B at 0064.)

19.     Due to ongoing and worsening complaints of rib pain, Plaintiff was sent for additional x-rays on April 11, 2019.  (ECF No. 56-1, MSJ, Ex. B at 0040, 0046-0048.)

20.     Radiologist Martin Laufik reviewed and interpreted the April 11, 2019 x-rays, finding mild left lung base atelectasis, mildly displaced left anterolateral fourth through eight rib fractures and a possible subtle left third rib injury.  The impression was "multiple left rib fractures."  (ECF No. 56-1, MSJ, Ex. B at 0046-0048.)

21.     On April 12, 2019, the April 11, 2019 x-ray findings were discussed by RN Asuncion and Plaintiff was also advised of the results.  (ECF No. 56-1, MSJ, Ex. A at 116:13-117:11; Ex. B at 0046-0048.)

22.     Following receipt of the April 11, 2019 x-ray findings, no treatment was recommended, other than to "take it easy," "don't get into any altercation" and to give it time to heal.  (ECF No. 56-1, MSJ, Ex. A at 117:21-118:10.)

23.     Plaintiff received a copy of the April 11, 2019 x-ray report approximately two weeks later.  (ECF No. 56-1, MSJ, Ex. A at 118:11-17.)

24.     On April 18, 2019, Plaintiff was taken to Adventist Hospital for his high blood pressure.  (ECF No. 56-1, MSJ, Ex. A at 118:11-17.)

25.     While at Adventist Hospital, Plaintiff asked the doctor about his ribs and the doctor said that he had some old wounds on his ribs but did not recommend or provide any treatment with respect to the rib injury.  (ECF No. 56-1, MSJ, Ex. A at 130:1-22.)

26.     On April 23, 2019, PA Relevante noted that Plaintiff's April 11, 2019 x-ray showed multiple rib fractures.  (ECF No. 56-1, MSJ, Ex. B at 0036.)

27.     On May 2, 2019, Plaintiff was seen by Nurse Grewal, who noted that he complained of rib pain and stated that he had a history of rib fracture but indicated that the pain was better at that time.  (ECF No. 56-1, MSJ, Ex. B at 0016.)

28.     On May 8, 2019, Plaintiff refused to undergo a follow-up x-ray, advising Dr. Sao that he believed that the medical providers, including the x-ray technicians, were "covering up" his rib fractures, and advised that he was refusing the x-ray because, "why so you guys can fake the results?"  (ECF No. 56-1, MSJ, Ex. A at 124:6-125:23, Ex. B. at 0034.)

29.     Dr. Sao noted that the rib fractures were objectively healing and there was no reason to prescribe a stronger pain medication; Plaintiff's exam was unremarkable, he was able to move normally, and he was in no distress.  (ECF No. 56-1, MSJ, Ex. B at 0034.)

30.     Dr. Sao added, "I suspect he has secondary gain issues – asking for names and claiming that there is a purposeful covered (sic) by the radiology techs and CDCR in general.  He has no signs of pulmonary compromise.  He refused repeated X-ray to see if fully healed.  I told him it may take another month."  (ECF No. 56-1, MSJ, Ex. B at 0034.)

31.     Plaintiff was instructed to avoid heavy lifting and pushups, burpies, and pull ups for another month.  (ECF No. 56-1, MSJ, Ex. B at 0034.)

32.     On August 16, 2019, Plaintiff was involved in another "battery/altercation," and he complained that he had reinjured his ribs when he was thrown into a wall.  (ECF No. 56-1, MSJ, Ex. A at 126:19-24; Ex. B. at 0059.)

33.     Maggie Francis, RN saw Plaintiff on August 17, 2019, and noted his chief complaint included rib pain due to a reinjury to his left rib, after "use of force/battery" the prior morning.  (ECF No. 56-1, MSJ, Ex. B at 0002.)

34.     Plaintiff was seen by Dr. Sao on August 26, 2019 for follow up of his left rib cage pain "after altercation several days ago" at which time he had sharp pain over the seventh rib cage area.  (ECF No. 56-1, MSJ, Ex. B at 0030-0031.)

25.     An x-ray completed on August 26, 2019, and read by Dr. Goller, noted an old left

10

1    seventh rib fracture.  (ECF No. 56-1, MSJ, Ex. B at 0031, 0045.)

2         26.      In his August 26, 2019 assessment, Dr. Sao noted, "healed old 7th rib fracture –

3    suspect aggravated during claimed altercation last week."  (ECF No. 56-1, MSJ, Ex. B at 0031.)

4         27.      To treat the aggravated injury, Plaintiff was given a wrap and Tylenol 3.  (ECF

5    No. 56-1, MSJ, Ex. A at 128:5-21.)

6         **C.      Analysis of Defendant's Motion for Summary Judgment**

7         Plaintiff contends that Defendant Dr. Goller intentionally falsified the radiology report to

8    reflect no rib fractures or broken bones and denied and/or delayed treatment through a cover-up

9    of the alleged use of force.

10        Defendant Goller argues that "the undisputed evidence shows that [he] properly read the

11    x-ray with which he was presented, without any knowledge of the altercation that preceded the

12    order for the x-ray."  Furthermore, Defendant argues that even assuming he misread and/or

13    misdiagnosed Plaintiff's condition, such claims sounds in negligence, not deliberately

14    indifference.

15        In opposition, Plaintiff argues that there are "issues of fact" regarding whether he had a rib

16    fracture on March 8, 2019 and whether Dr. Goller misread the x-ray.

17        In reply, Defendant argues that even if Plaintiff can demonstrate that he had a rib fracture

18    on March 8, 2019, there is no evidence to create a material fact as whether Dr. Goller acted with

19    deliberate indifference in interpreting the x-rays.

20        While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical

21    care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference

22    to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012),

23    overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014);

24    Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th

25    Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat

26    [his] condition could result in further significant injury or the unnecessary and wanton infliction of

27    pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm,

28    680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).   The requisite state of mind is one of subjective

recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989), overruled in part on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986).  Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).).  In addition, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1977); Snow v. McDaniel, 681 F.3d at 987-88, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122.

Here, the undisputed evidence demonstrates that Dr. Goller was the radiologist that read and interpretated Plaintiff's March 8, 2019 x-ray.  (UF 13.)  The clinical history for the x-ray was noted as "Left rib pain." (UF 14.)  Dr. Goller's findings were as follows: "No fracture, lytic lesion, or sclerotic lesion is seen involving the ribs.  No pleural effusion or pneumothorax is present.  The visualized lungs are clear.  The visualized portion of the heart and the mediastinum are unremarkable" and his impression was "No rib abnormality identified." (UF 15.)

On or about March 27, 2019, PA Relevante told Plaintiff that the x-ray did not show any fracture.  (UF 16.)

On March 27, 2019, the date Plaintiff was told the March 8, 2019 x-ray did not show anything, including a rib fracture, Plaintiff believed that "everybody that I came in contact with" "was misrepresenting the truth" and that "there was a coverup from the beginning when I told them my ribs was broke … all the way to the second set of x-rays." (UF 17.)  Plaintiff again complained of left rib pain on March 28, 2019.  (UF 18.)  Due to ongoing and worsening complaints of rib pain, Plaintiff was sent for additional x-rays on April 11, 2019.  (UF 19.)

1  Radiologist Martin Laufik reviewed and interpreted the April 11, 2019 x-rays, finding

2  mild left lung base atelectasis, mildly displaced left anterolateral fourth through eight rib fractures

3  and a possible subtle left third rib injury.  The impression was "multiple left rib fractures."  (UF

4  20.)

5  On April 12, 2019, the April 11, 2019 x-ray findings were discussed by RN Asuncion and

6  Plaintiff was also advised of the results.  (UF 21.)  Following receipt of the April 11, 2019 x-ray

7  findings, no treatment was recommended, other than to "take it easy," "don't get into any

8  altercation" and to give it time to heal.  (UF 22.)  Plaintiff received a copy of the April 11, 2019

9  x-ray report approximately two weeks later.  (UF 23.)

10  Defendant submits the expert opinion of radiologist, Dr. Seidenwurm[2] who declares, in

11  pertinent part, as follows:

12      In summary, based on my medical training, education and experience, as well as my
13      review of the pertinent records in this case, it is my professional opinion as a board
        certified radiologist, that Dr. Goller's interpretation of [Plaintiff's] March 8, 2019 left rib
14      x-ray was reasonable, appropriate and within the standard of care.  Specifically, it is my
        opinion that Dr. Goller's report that no fracture is seen in that x-ray is correct and within
15      the standard of care.  Further, the fact that Martin Laufik, M.D. saw multiple left rib
        fractures on the April 11, 2019 rib x-ray does not change my opinion that Dr. Goller's
16      interpretation of the March 8, 2019 x-ray met the standard of care.  Similarly, the
        interpretation of the images taken on April 18, 2019, August 19, 2019 and August 26,
17      2019 does not change my opinion that Dr. Goller's interpretation of the March 8, 2019 x-
        ray met the standard of care.
18

19  (Declaration of Dr. David Seidenwurm, at ¶ 17.)

20  In addition, at his deposition, Plaintiff testified that he lacked knowledge as to whether Dr.

21  Goller was participating in a "cover up."  More specifically, Plaintiff testified as follows:

22      A.    Okay.  I'm saying this: There was a coverup from the beginning when I told them

23            my ribs was broke in that program office.

24      Q.    Okay.

25  _____

26  [2] Dr. Seidenwurm obtained his undergraduate degree from Stanford University in 1978, and his medical degree from
    Harvard University in 1982.  He completed an internship at Kaiser Foundation Hospital in San Francisco, California.
27  He then completed a residency in Diagnostic Radiology at Stanford University and a fellowship in
    Neuroradiology from New York University Medical Center, where he also served as the Chief Fellow.  He has been a
28  practicing radiologist in the clinical setting since 1988, and presently serves as a neuroradiologist at numerous
    hospitals in Sacramento, California and surrounding areas.  (Declaration of Dr. David Seidenwurm, at ¶ 2.)

| | | |
|---|---|---|
| 1 | A. | And all the way to the second set of X-rays. |
| 2 | Q. | Okay.  Who did you think was involved in the coverup?  Are you saying every |
| 3 | | provider there?  Was it certain providers? Who? |
| 4 | A. | Relevante.  Graywall.  The technicians.  That's it.   That's all that I seen. |
| 5 | Q. | Okay.  Do you think Dr. Goller was involved in the coverup? |
| 6 | A. | Well, you know, this is the thing, sir.  I hadn't seen the X-rays.  I haven's seen |
| 7 | | them.  So my thinking is that this other doctor seen them a month - - a week later, |
| 8 | | and they seen that I had multiple fractured ribs and coincide with the 8th.  Then |
| 9 | | how come Mr. Goller miss it - - miss the X-rays? |
| 10 | Q. | I understand your testimony.  Is it your belief that Dr. Goller intentionally |
| 11 | | misinterpreted the X-rays to cover up some bad acts by some officers? |
| 12 | A. | Either that or they give him the wrong X-rays. |
| 13 | Q. | One or the other, right? |
| 14 | A. | (Witness nods head.) |
| 15 | … | |
| 16 | Q. | … Do you know one way or the other whether Dr. Goller knew at the time that he |
| 17 | | looked at your x-rays that you had got in this altercation with the officers? |
| 18 | A. | I can't say.  I don't know. |
| 19 | … | |
| 20 | Q. | But – but you don't know one way or the other whether he knew that your were |
| 21 | | involved in this altercation; right. |
| 22 | A. | I don't know that. No. |

23  (ECF No. 56-1, MSJ, Ex. A at 111:6-112:5; 113:19-22; 114:17-20.)

24  Defendant Dr. Goller declares:

25  When I receive x-ray images of prisoners, or any patient for that matter, I receive very

26  little information about their medical history or the clinical history preceding the need for
    the x-ray with which I am presented.  In this case, according to the records, the

27  information I received with the x-rays was, in its entirety, as follows: "rib pain;
    altercation."  I was not made aware of the identity of any other participant to the

28

1    altercation, nor was such information relevant to my interpretation of the x-rays.  Only
2    upon receipt of the lawsuit years after the fact, did I learn that the altercation at issue was
     with correctional officers.

3  (Declaration of Dr. Goller, at ¶ 7.)

4       Even assuming, without deciding, that Plaintiff suffered a fractured left rib on March 8,

5  2019, Plaintiff has not presented any evidence, beyond his mere speculation, that Dr. Goller

6  intentionally misread the x-rays to reflect no fractured rib.  Rather, the evidence before the Court,

7  demonstrates that Dr. Goller timely and appropriately read the x-rays presented to him and

8  provided his findings and interpretation consistent with the applicable standard of care.

9  (Declaration of Dr. David Seidenwurm, at ¶ 17.)  While later x-rays revealed a rib fracture, expert

10 evidence reflects that it is not possible to state when the fracture occurred and/or became evidence

11 on the x-ray.

12      Furthermore, Plaintiff's argument that Dr. Laufik's interpretation of the April 11, 2019, x-

13 rays noting multiple rib fractures contradicts Dr. Goller's finding is unfounded.  Dr. Laufik

14 specifically declares that neither his April 11, 2019 report nor his April 12, 2019 addendum,

15 contain any findings, interpretations or opinions with regard to Plaintiff's March 8, 2019 x-ray,

16 and nothing in either of those reports "contained or was intended to imply, any agreement,

17 disagreement, comment, or opinion with respect to the March 8, 2019 report prepared by Dr.

18 Goller concerning the x-ray of that date."  (ECF No. 63, Declaration of Doctor Martin Laufik, at

19 ¶¶ 8-9.)  Thus, while the comparison was noted, Dr. Laufik made no determination whatsoever as

20 to the interpretation of the March 8, 2019 x-rays.   In addition, contrary to Plaintiff's contention,

21 the April 12, 2019 addendum was drafted by Dr. Laufik only to indicate that he discussed his

22 April 11, 2019 report with RN Asuncion on April 12, 2019.  (Id.)

23      In support of his contention, Plaintiff has submitted the July 3, 2019 response  to his

24 health care grievance regarding the alleged false x-ray.  (ECF No. 62 at pp. 47-48.)  Notably, this

25 response was drafter after Plaintiff's diagnosis of rib fracture, after review of the relevant medical

26 records including both x-rays and both reports, and prior to litigation being initiated.  Also, the

27 response noted that "sometimes fractures can be so small they get missed when the file is

28

1    reviewed," and specifically found that Plaintiff's medical records indicated that there was no

2    evidence to suggest the results were tampered with or falsified.  (Id.)  Nonetheless, even if it is

3    assumed that Dr. Goller misread the March 8, 2019 x-ray, such misdiagnosis demonstrates, at

4    best, evidence of negligence, not deliberate indifference.  See Wilhelm v. Rotman, 680 F.3d at

5    1123 (doctor's decision not to operate because he incorrectly concluded plaintiff was not suffering

6    from a hernia could not establish Eighth Amendment violation); see also Griffith v. Franklin Cty.,

7    Ky., 975 F.3d 554, 573 (6th Cir. 2020) (negligent failure to take more aggressive steps to monitor

8    plaintiff's health would not violate Eighth Amendment); Self v. Crum, 429 F.3d 1227, 1233 (10th

9    Cir. 2006) (negligent failure to diagnose respiratory condition did not violate Eighth

10   Amendment).

11        To the extent Plaintiff contends that Dr. Goller "intentionally falsified" the report of the

12   March 8, 2019 x-ray at the hands of other individuals or based on an alleged conspiracy or cover

13   up, such claim is not supported by admissible evidence.   Plaintiff must present competent

14   evidence to substantiate each allegations.  Plaintiff's repeated claims that Dr. Goller's actions and

15   "incorrect" interpretation of the x-ray were "deliberate," "intentional," and part of a "cover up,"

16   are not supported by any admissible evidence.  See, e.g., FTC v. Publ'g Clearing House, Inc., 104

17   F.3d 1168, 1171 (9th Cir. 1997) (as amended) ("A conclusory, self-serving affidavit, lacking

18   detailed facts and any supporting evidence, is insufficient to create a genuine issue of material

19   fact."); Anheuser-Busch, Inc. v. Nat. Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995).

20   Plaintiff bears the burden of proving such allegations. See Johnson v. Roche, 2009 WL 720891, at

21   *10 (E.D. Cal. Mar. 13, 2009), findings and recommendations adopted, 2009 WL 902261 (E.D.

22   Cal. Mar. 31, 2009)).  Neither Plaintiff's alleged treatment by other individuals or the alleged

23   improper reading of an x-ray constitute "competent evidence" of a conspiracy, cover up or

24   deliberate indifference.  Indeed, the Court is not required to accept Plaintiff's self-serving

25   statements where they are contradicted by such doctor's declarations and medical records, as well

26   as the medical records of other medical staff and specialists, and test results. See Bond v. Knoll,

27   2014 WL 7076901, at *10 (C.D. Cal. Dec. 10, 2014) (plaintiff's speculation that defendants'

28   declarations and exhibits were fabricated was insufficient to defeat summary judgment); Toscano

16

1   v. Embree, 2007 WL 2753366, at *5 (N.D. Cal. Sept. 19, 2007) (explaining that the plaintiff

2   cannot create a triable issue of fact by simply misrepresenting the contents of a document).

3   Further, even assuming, that Dr. Goller misread the March 8, 2019 x-ray, there is no evidence that

4   he did so with the intent to deprive Plaintiff of his rights to adequate medical treatment.

5           Lastly, Plaintiff's claim that he is not required to produce "direct evidence" of a cover up

6   and that an agreement constituting a cover up may be inferred from circumstantial evidence, is

7   without merit.  As stated above, Plaintiff has not produced any evidence, direct or circumstantial,

8   that Dr. Goller was somehow involved in a conspiracy to deny him medical care, to cover up the

9   alleged excessive force by officers tor to deny him his civil rights.  There is no evidence that Dr.

10  Goller knew the officers, that Dr. Goller knew Plaintiff had been in an altercation with officers,

11  that Dr. Goller was aware of an effort to coverup any action by the officers or that Dr. Goller had

12  ever spoken to the involved officers about anything, let along spoken to them about Plaintiff.

13  Indeed, the evidence demonstrates otherwise as Plaintiff testified under oath that he does not

14  know whether Dr. Goller even knew about the altercation with the officers, and Dr. Goller

15  specifically declares that he was unaware.  (ECF No. 56-1, MSJ, Ex. A at 111:6-112:5; 113:19-

16  22; 114:17-20; Ex. C, Goller Decl. at ¶¶ 7-8.)  In his opposition, Plaintiff argues that he believes

17  certain actions are evidence of a conspiracy; however, Dr. Goller is only mentioned in passing

18  based on a remote interpretation of an x-ray.  (ECF No. 62, at pp. 12-13.)  The mere fact that Dr.

19  Goller was aware that Plaintiff had "left rib pain and was in an altercation" does not demonstrate

20  a conspiracy to cover up any alleged use of force by officers.  Plaintiff's argument tries to jam an

21  allegation supporting an "after-the-fact" conspiracy — a cover-up of Plaintiff's March 8, 2019 x-

22  ray — into the conspiracy that he alleges caused him injuries.  In sum, without more, Plaintiff's

23  claim that Defendant Dr. Goller falsified the reports of the March 8, 2019 x-ray in an attempt to

24  cover up officers' use of force is conclusory, unsupported, and insufficient to raise a genuine

25  issue of material fact precluding summary judgment.  Ivey v. Board of Regents, 673 F.2d 266,

26  268 (9th Cir. 1982).  Accordingly, Defendant Dr. Goller is entitled to summary judgment

27  dismissing Plaintiff's deliberate indifference claim.[3]

28  _____

[3] Because the Court has found that Defendant's motion for summary judgment should be granted on the merits, the

**IV.**

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that Defendant Dr. Goller's motion for summary judgment be granted and judgment be entered in his favor.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-one (21)** days after being served with this Findings and Recommendation, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __July 28, 2023__

_____
UNITED STATES MAGISTRATE JUDGE

---

Court does not reach the alternative argument regarding the statue of limitations bar.

18